# UNITED STATES DISTRICT COURT
## District of Kansas
(Kansas City Docket)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KAABA MAJEED,
YUNUS RASSOUL, a.k.a. Yunus Rassoull,
JAMES STATON, a.k.a. Adam Winthrop,
RANDOLPH RODNEY HADLEY,
DANIEL AUBREY JENKINS,
DANA PEACH,
ETENIA KINARD, a.k.a. Etenia Kinnard, and
JACELYN GREENWELL,

    Defendants.

CASE NO. 21-20060-JAR-JPO
Filed Under Seal

# INDICTMENT

**THE GRAND JURY CHARGES**:

Introduction

At all times material to the indictment:

1. United Nation of Islam (UNOI) was an organization that was founded by Royall Jenkins ("Jenkins"). Contrary to the teachings of the Islamic faith, Jenkins represented that he, himself, was Allah, or God. Jenkins claimed that in approximately

1

1978, he was abducted by angels who transported him through the galaxy in a spaceship and instructed him how to rule on Earth.

2. Jenkins began gathering members in Maryland but later moved the UNOI headquarters in the late 1990s to Kansas City, Kansas, where the organization continued to grow in membership. UNOI eventually grew to include hundreds of members.

3. United Nation of Islam, Inc. was incorporated in 1999 in the State of Louisiana with Jenkins as its President and defendant **JAMES STATON,** a.k.a. Adam Winthrop **("STATON")**, as its Secretary.

4. Over the years since its inception, UNOI has also been known as The Value Creators and The Promise Keepers.

5. Jenkins led UNOI until approximately 2012. His responsibility was to oversee all activities of UNOI and approve all decisions after consultation with his wives and officials, who assisted him in managing UNOI operations.

6. Jenkins created, drove, and asserted UNOI principles, which included rules that members had to follow, required "duty" or unpaid labor, and emphasized the eternal consequences of noncompliance.

7. UNOI operated locations or "temples" in various cities around the United States, including but not limited to Kansas City, Kansas; New York, New York; Cincinnati, Ohio; Atlanta, Georgia; Raleigh, North Carolina; and Newark, New Jersey. The term "temple" did not denote any specific building, physical structure, or house of worship, but

rather referenced a geographic area where UNOI operated businesses or where a significant number of members resided.

8. UNOI had a national and local organizational structure. Nationally, there was a Secretary, Lieutenant, and Minister, as well as other specialized positions, such as a leader who oversaw the youth or men. Local leadership of each individual "temple" generally mirrored the national leadership structure, such that each individual "temple" had a local Secretary, Lieutenant, and Minister, as well as a position referred to as Captain. Jenkins appointed these officials.

9. Jenkins was the overall leader, referred to within the organization as "Allah," or "Father." **STATON** helped grow the organization along with Jenkins and became National Secretary. Defendants **KAABA MAJEED ("MAJEED")**, **YUNUS RASSOUL ("RASSOUL")**, **RANDOLPH RODNEY HADLEY ("HADLEY")**, and **DANIEL AUBREY JENKINS ("AUBREY")** also quickly rose to official status within UNOI. **MAJEED** became National Lieutenant; **RASSOUL** became National Minister; **HADLEY** became a Captain; and **AUBREY** oversaw the male membership. Defendants **ETENIA KINARD ("KINARD")**, **DANA PEACH ("PEACH")**, and **JACELYN GREENWELL ("GREENWELL")** were three of Jenkins's many wives. **KINARD** and **GREENWELL** oversaw the youth membership. All of the defendants assisted Jenkins in managing the organization.

10. UNOI opened and operated at least ten businesses around the United States that were staffed entirely by unpaid UNOI members. These businesses were primarily restaurants and bakeries, but also included other businesses such as a gas station and

clothing store. UNOI required members to staff these businesses as part of their "duty," and did not pay these members, many of whom were minor children or young adults. UNOI operated businesses in Kansas City, Kansas; Newark, New Jersey; New York, New York; Wichita, Kansas; Cincinnati, Ohio; Dayton, Ohio; Temple Hills, Maryland; Baltimore, Maryland; Atlanta, Georgia; New Haven, Connecticut; Hamden, Connecticut; Durham, North Carolina; Mobile, Alabama; and elsewhere.

11. UNOI recruited hundreds of full-time and part-time members. Full-time members lived in housing provided by UNOI and worked without pay at UNOI businesses. Part-time members lived and worked outside of UNOI but donated financially to UNOI. UNOI employed without pay many children who joined with their parents or were born to parents who were already members of the organization.

12. UNOI encouraged many adult members to send their children to Kansas City, Kansas for the purpose of attending a UNOI-run school and working in UNOI-operated businesses. UNOI enticed parents to send their children by promising a fulsome education and the development of life skills through working in UNOI-operated businesses. UNOI did not inform the parents that their children would work extended hours, sometimes in lieu of attending school, or be sent to other UNOI businesses around the country to work extended hours and receive no legitimate education.

13. UNOI "dispatched" and transported the children of adult members around the country to work at UNOI businesses. "Dispatching" was the practice of deciding that youth members would move to and work in a specific location without pay, and then transporting those youth members to that location, typically without their parents or other

adult family members. UNOI housed these youth members with other non-familial adult members or in UNOI-operated dormitories or barracks. UNOI did not always tell the youth members' parents where or when they were "dispatching" their children.

14. Each UNOI business had a manager, and each house or dormitory had an adult member in charge. The members at each "temple" reported to the business and house managers. These managers then reported to local officials, such as the First Lieutenant or Captain, or sometimes directly to national officials such as the National Lieutenant.

15. The defendants required the youth members to live in crowded conditions, follow a very restricted diet, and work long hours in UNOI-operated businesses. Conversely, the defendants and their immediate families typically resided in spacious accommodations, ate what they wanted, and worked at their own discretion.

## COUNT 1

### CONSPIRACY TO COMMIT FORCED LABOR
### [18 U.S.C. § 371]

16. On or about October 28, 2000 and continuing through November 30, 2012, in the District of Kansas and elsewhere, the defendants,

**KAABA MAJEED,**
**YUNUS RASSOULL, a.k.a. Yunus Rassoul**
**JAMES STATON, a.k.a. Adam Winthrop,**
**RANDOLPH RODNEY HADLEY,**
**DANIEL AUBREY JENKINS,**
**DANA PEACH,**
**ETENIA KINARD, a.k.a. Etenia Kinnard, and**
**JACELYN GREENWELL,**

and others known and unknown to the Grand Jury, did knowingly conspire and agree with each other to provide and obtain the labor and services of one and more persons by

5

threats of serious harm to, and physical restraint against, that person and another person; by means of any scheme, plan, and pattern intended to cause the person to believe that, if the person did not perform such labor and services, that person and another person would suffer serious harm and physical restraint; and by means of the abuse and threatened abuse of law and the legal process, in violation of 18 U.S.C. § 1589.

### Object of the Conspiracy

17. The factual allegations in paragraphs 1 through 15 of this Indictment are incorporated by reference and realleged as though fully set forth herein.

18. The object of the conspiracy was for the defendants, and others known and unknown to the grand jury, to obtain the uncompensated labor and services of at least one victim in the District of Kansas and elsewhere.

### Manner and Means of the Conspiracy

The manner and means by which the co-conspirators carried out the object of the conspiracy included, but were not limited to, the following:

19. Although members could be any age, the defendants primarily relied on the labor and services of young victims, many of whom were minors, to benefit financially. UNOI compelled the labor and services of victims as young as eight years old.

20. The defendants very rarely allowed the victims to live with their parents. They instead housed the victims in overcrowded dormitories, barracks, or households of adult members who were not related to the victims.

21. Jenkins created rules to control the victims while the other defendants enforced the rules.

22. The defendants controlled the whereabouts of all of the victims. The defendants transported the victims to different cities on a regular basis, sometimes with mere hours' notice.

23. Jenkins controlled what the members viewed and read. He generally restricted victims to reading UNOI publications and did not allow outside newspapers or books.

24. The defendants required the victims to dress in UNOI-made clothing and use UNOI-produced toiletries. Victims had to make official requests for outside clothing or toiletries, and the defendants routinely denied such requests.

25. The defendants also restricted communications. They often required the victims to ask permission to speak, and prohibited victims from using certain words such as "hello," and "say." The defendants generally prohibited victims from speaking to members of the opposite sex, or to non-members, including non-members from their own families. The defendants also controlled whether victims could speak to their families and parents within UNOI and often monitored those calls.

26. The defendants directed the victims to shower in a certain way and required some victims to undergo colonics performed by adult members. A colonic is a procedure designed to cleanse the colon by streaming gallons of water through a tube inserted into the rectum.

27. The defendants controlled the diet of their members, restricting many of the victims to eat only bean soup, salad, and occasionally fruit. They also restricted many of

the victims to two meals per day, or ordered them to "cleanse" by consuming only lemon juice for days. The defendants required the victims, particularly female victims, to maintain a certain weight. Jenkins's wives subjected female victims to weekly weigh-ins where they would humiliate the victims for their weight and subsequently make them fast.

28. The defendants did not allow the victims to come and go freely from their residences. With few exceptions, the defendants required the victims to be transported or accompanied everywhere by a UNOI member, usually an official or trusted member.

29. The defendants rarely permitted victims to seek outside medical attention. The defendants often denied victims medical attention altogether. When a defendant did allow a victim to receive medical attention, they sent the victim to a doctor employed by UNOI or to **PEACH,** who was not a licensed medical doctor. **PEACH** would then personally "treat" the victims herself.

30. The defendants required the victims to perform "duty," which consisted of working long hours without pay in UNOI-owned businesses such as bakeries, restaurants, gas stations, a sewing factory, a factory that produced personal hygiene products, and others. The defendants also required many victims to perform "duty" in households, such as cleaning and childcare. The defendants required some victims to work up to 16 hours per day without compensation.

31. The defendants did not permit the victims to receive an accredited education from a licensed school. UNOI ran its own unlicensed school known as the "University of Arts and Logistics of Civilization" (UALC) in Kansas City, Kansas, in the District of Kansas. Victims who lived in Kansas City, Kansas attended the UALC but did not receive

appropriate instruction in traditional subjects such as mathematics, reading, writing, and science. The defendants denied the victims who lived outside of Kansas City, Kansas of any legitimate education, and required them to provide labor in lieu of attending school.

32. The defendants regularly conducted meetings with large groups of members to humiliate the victims and other members who committed "infractions." Infractions included failing to follow rules or properly perform "duty," as well as innumerable other offenses, such as stealing food. During these meetings, the defendants called victims to a microphone in order to humiliate them by announcing their infraction and punishment to other members.

33. The defendants regularly punished the victims who committed infractions. The punishments included withholding food, silence, public humiliation, extra "duty," and physical abuse. Physical abuse included hitting victims with a paddle, among other actions.

34. The defendants instilled in the victims a fear of noncompliance and a fear of leaving UNOI and UNOI housing. The defendants promoted the idea that the victims "owed a duty to Allah," which meant working at UNOI businesses. The defendants convinced the victims that if they did not comply with the rules, including performing their "duty," or if they left UNOI, they would burn in an "eternal hellfire" or experience tragedy.

## Overt Acts

35. In furtherance of the conspiracy, and to accomplish the object of the conspiracy, at least one of the defendants committed or caused to be committed at least one of the following overt acts, among others, in the District of Kansas, and elsewhere:

36. In or about and between October 2002 and October 2003, **KINARD** and **GREENWELL** punished Minor Victim 1 ("MV-1"), whose identity is known to the grand jury, for burning a pie at the UNOI-operated bakery in Kansas by requiring MV-1 to make extra pies and causing MV-1 to work until midnight.

37. On or about and between October 28, 2000 and December 31, 2004, **AUBREY, MAJEED,** and **HADLEY** used a paddle to hit Minor Victim 2 ("MV-2"), whose identity is known to the grand jury, as punishment on multiple occasions in Kansas.

38. In or about and between 2003 and 2005, **KINARD** beat Minor Victim 3 ("MV-3"), whose identity is known to the grand jury, with an extension cord for neglecting to throw out a diaper while MV-3 provided childcare in a UNOI-run household.

39. On or about and between 2004 and 2006, **RASSOUL** refused to allow MV-3 to seek proper medical attention and recuperate when MV-3 fainted from fatigue and hit MV-3's head on a brick floor while working at a restaurant that **RASSOUL** managed in Connecticut.

40. In or about and between 2004 and 2006, **STATON** denied Minor Victim 4 ("MV-4"), whose identity is known to the grand jury, use of MV-4's inhaler to treat MV-4's diagnosed asthma when MV-4 lived and performed household work in his home, located in Kansas.

41. In or about 2007, Jenkins and **PEACH** transported MV-1 from Kansas to New Jersey for the purpose of securing MV-1's labor.

42. On or about and between October 28, 2000 and December 31, 2008, Jenkins, **MAJEED, RASSOUL, AUBREY, STATON, KINARD, PEACH,** and **GREENWELL**

made decisions about where in the country to move victims for labor. The defendants made these decisions through in-person discussions that occurred in the District of Kansas or through telephonic discussions in which some defendants were physically present in the District of Kansas.

43. On or about and between October 28, 2000 and December 31, 2008, Jenkins, **MAJEED, RASSOUL, AUBREY, STATON, KINARD,** and **GREENWELL** participated in meetings to decide which disciplinary action to impose on victims, such as withholding food. The defendants made these decisions through either in-person discussions that occurred in the District of Kansas or telephonic discussions in which some defendants were physically present in the District of Kansas.

44. In or about 2008, **MAJEED** instructed victims to lie to customers about their age and working status so that they could continue to work in the restaurant that he managed in New York.

45. Beginning on or about October 28, 2000 and continuing through on or about December 31, 2009, all dates being approximate and inclusive, **GREENWELL** was responsible for youth-related matters. In this capacity, she made decisions about victims' labor and services, as well as whether and how to discipline victims.

46. Beginning on or about and October 28, 2000 and continuing through on or about December 31, 2009, **AUBREY** engaged in "Fruit of Islam Beatdowns" or "FOI Beatdowns" in which he physically abused male UNOI members as punishment for infractions.

47. In or about and between 2008 and 2009, **MAJEED** transported MV-3 from Kansas to New Jersey for the purpose of securing MV-3's labor.

48. In or about and between 2008 and 2009, Jenkins announced to victims and members that he had his daughter killed for leaving UNOI.

49. In or about and between 2008 and 2009 Minor Victim 5 ("MV-5"), whose identity is known to the grand jury, and who was a local UNOI lieutenant in Kansas at the time, observed **HADLEY** punish a member by knocking him unconscious in the District of Kansas.

50. In or about and between 2008 and 2009, after MV-5 reported to Jenkins that **HADLEY** had punished a member too harshly, Jenkins indicated that he agreed with **HADLEY'S** punishment.

51. In or about and between 2008 and 2009, as a result of MV-5 reporting **HADLEY** to Jenkins, **MAJEED** punished MV-5 by not allowing MV-5 to speak without permission, requiring MV-5 to perform extra work hours, and stripping MV-5 of MV-5's position as lieutenant.

52. In or about 2010, **HADLEY** transported Minor Victim 6 ("MV-6"), whose identity is known to the grand jury, from Kansas to New Jersey for the purpose of securing MV-6's labor in a UNOI-operated restaurant.

53. On or about and between 2005 and 2011, **PEACH** supervised UNOI businesses in New Jersey and New York. In her roles as supervisor, she made decisions about victims' labor and services, as well as whether and how to discipline victims.

54. On or about and between October 28, 2000 and December 31, 2011, **KINARD** was responsible for youth-related matters. In this capacity, she made decisions about victims' labor and services, as well as whether and how to discipline victims.

55. In or about and between 2003 and 2012, **RASSOUL** supervised a UNOI-operated restaurant in Connecticut. In his role as supervisor, he made decisions about victims' labor and services, as well as whether and how to discipline victims.

56. In or about and between 2005 and 2012, **MAJEED** supervised a UNOI location in New Jersey where multiple victims and other UNOI members lived in overcrowded conditions, such as ten or more individuals in a bedroom.

57. In or about and between 2007 and 2012, **MAJEED** and **RASSOUL** supervised a UNOI-operated restaurant in North Carolina.

58. On or about and between October 28, 2000 and January 2012, Jenkins, **MAJEED, RASSOUL, AUBREY,** and **STATON** led meetings in which they publicly chastised the victims and other individuals for violating UNOI rules. The defendants held these meetings in the District of Kansas and elsewhere.

59. Beginning in or about October 28, 2000 and continuing through in or about November 30, 2012, all dates being approximate and inclusive, in the District of Kansas and elsewhere, **HADLEY** used a paddle on multiple occasions to hit victims as punishment.

60. On or about and between October 28, 2000 and November 30, 2012, **MAJEED** and **RASSOUL** supervised UNOI businesses in Kansas. In their roles as

supervisors, they made decisions about victims' labor and services, as well as whether and how to discipline victims.

61. On or about and between October 28, 2000 and November 30, 2012, **MAJEED** and **HADLEY** engaged in "Fruit of Islam Beatdowns" or "FOI Beatdowns" in which they physically abused male UNOI members as punishment for infractions.

62. On or about and between October 28, 2000 and November 30, 2012, Jenkins led and participated in meetings in which he addressed UNOI members and discussed UNOI principles. Jenkins held these meetings in Kansas and elsewhere.

63. On or about and between January 1, 2005 and November 30, 2012, **MAJEED** supervised UNOI businesses in New Jersey and New York. In his role as supervisor, he made decisions about victims' labor and services, as well as whether and how to discipline victims.

In violation of Title 18, United States Code, Sections 371 and 1589.

## COUNTS 2 THROUGH 8

### FORCED LABOR
### [18 U.S.C. § 1589]

64. Beginning on or about the dates listed below, and continuing through on or about the corresponding dates indicated below, in the District of Kansas and elsewhere, the below-named defendants, and others known and unknown to the Grand Jury, aiding and abetting each other and others, did knowingly provide and obtain the labor and services of the victims referenced in each respective count below, whose identities are known to the grand jury, by threats of serious harm to, and physical restraint against, that

person and another person; by means of any scheme, plan, and pattern intended to cause the person to believe that, if the person did not perform such labor and services, that person and another person would suffer serious harm and physical restraint; and by means of the abuse and threatened abuse of law and the legal process, and attempted to do so:

| COUNT | VICTIM | DEFENDANTS | APPROXIMATE DATES OF FORCED LABOR |
|---|---|---|---|
| 2 | MV-3 | Kaaba Majeed, Yunus Rassoul, James Staton, Dana Peach, Etenia Kinard, Jacelyn Greenwell | October 28, 2000-August 31, 2012 |
| 3 | MV-7 | Kaaba Majeed, Yunus Rassoul, James Staton, Etenia Kinard, Jacelyn Greenwell | October 28, 2000-February 28, 2012 |
| 4 | MV-8 | Kaaba Majeed, James Staton, Etenia Kinard, Jacelyn Greenwell | October 28, 2000-November 30, 2012 |
| 5 | MV-9 | Kaaba Majeed, Yunus Rassoul, James Staton, Daniel Aubrey Jenkins | October 28, 2000-November 30, 2012 |
| 6 | MV-10 | Kaaba Majeed, James Staton, Randolph Rodney Hadley, Etenia Kinard | January 1, 2001-November 30, 2012 |

| | | | |
|---|---|---|---|
| 7 | MV-5 | **Kaaba Majeed, James Staton, Randolph Rodney Hadley, Daniel Aubrey Jenkins, Jacelyn Greenwell** | January 1, 2002-November 30, 2011 |
| 8 | MV-4 | **Kaaba Majeed, James Staton, Randolph Rodney Hadley** | January 1, 2004-March 31, 2012 |

In violation of Title 18, United States Code, Sections 1589, 1594(a), & 2.

## FORFEITURE NOTICE

65. The allegations contained in Counts 1-8 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1594.

66. Upon conviction of one or more of the offenses set forth in Counts 1-8, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 1594, (1) any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of the offenses, and any property traceable to such property; and (2) any property, real or personal, constituting or derived from, any proceeds obtained, directly or indirectly, as a result of the offenses, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

> A. A forfeiture money judgment against defendant **Kaaba Majeed** in an amount equal to the amount of gross proceeds obtained or derived by him from the commission of Counts 1-8;

> B. A forfeiture money judgment against defendant **Yunus Rassoul** in an amount equal to the amount of gross proceeds obtained or derived by him from the commission of Counts 1, 2, 3, and 5;

16

C. A forfeiture money judgment against defendant **James Staton** in an amount equal to the amount of gross proceeds obtained or derived by him from the commission of Counts 1-8;

D. A forfeiture money judgment against defendant **Randolph Rodney Hadley** in an amount equal to the amount of gross proceeds obtained or derived by him from the commission of Counts 1, and 6-8;

E. A forfeiture money judgment against defendant **Daniel Aubrey Jenkins** in an amount equal to the amount of gross proceeds obtained or derived by him from the commission of Counts 1, 5, and 7;

F. A forfeiture money judgment against defendant **Dana Peach** in an amount equal to the amount of gross proceeds obtained or derived by her from the commission of Counts 1 and 2;

G. A forfeiture money judgment against defendant **Etenia Kinard** in an amount equal to the amount of gross proceeds obtained or derived by her from the commission of Counts 1, 2, 3, 4, and 6;

H. A forfeiture money judgment against defendant **Jacelyn Greenwell** in an amount equal to the amount of gross proceeds obtained or derived by her from the commission of Counts 1, 2, 3, 4, and 7;

67. If any of the property described above, as a result of any act or omission of the defendants:

    A.    cannot be located upon the exercise of due diligence;

    B.    has been transferred or sold to, or deposited with, a third party;

    C.    has been placed beyond the jurisdiction of the court;

    D.    has been substantially diminished in value; or

    E.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

October 20, 2021              s/Foreperson
DATE                                FOREPERSON OF THE GRAND JURY

DUSTON J. SLINKARD
ACTING UNITED STATES ATTORNEY

By: /s/ Ryan J. Huschka
Ryan J. Huschka
Assistant United States Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas 66101
Ph: (913) 551-6730
Fax: (913) 551-6541
Email: Ryan.Huschka@usdoj.gov
Ks. S. Ct. No. 23840

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL

By: /s/ Vasantha Rao
Vasantha Rao
Trial Attorney
USDOJ Civil Rights Division
950 Pennsylvania Avenue NW
Ph: (202) 616-2576
Email: Vasantha.Rao@usdoj.gov
NY Bar No. 4402996

By: /s/ Kate A. Alexander
Kate A. Alexander
Trial Attorney
USDOJ Civil Rights Division

950 Pennsylvania Avenue NW
Ph: (202) 353-3539
Email: Kate.Alexander@usdoj.gov
FL Bar No. 27393

> IT IS REQUESTED THAT THE TRIAL BE HELD IN KANSAS CITY, KANSAS

# PENALTIES

### Count 1: Conspiracy, 18 U.S.C. § 371

- Punishable by a term of imprisonment of not more than five (5) years. 18 U.S.C. § 371.

- A term of supervised release of not more than three (3) years. 18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000. 18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.00. 18 U.S.C. § 3013(a)(2)(A).

- Forfeiture.

### Counts 2-8: Forced Labor, 18 U.S.C. § 1589

- Punishable by a term of imprisonment of not more than twenty (20) years. 18 U.S.C. § 1589(d).

- A term of supervised release of not more than three (3) years. 18 U.S.C. § 3583(b)(2).

- A fine not to exceed $250,000. 18 U.S.C. § 3571(b)(3).

- A mandatory special assessment of $100.00. 18 U.S.C. § 3013(a)(2)(A).

- A mandatory special assessment of $5,000. 18 U.S.C. § 3014(a).

- Forfeiture.